

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

SEP 20 2016

ARTHUR JOHNSTON

BY_____ DEPUTY

UNITED STATES OF AMERICA, *ex rel*:
GWENDOLYN PORTER

                         PLAINTIFF

V.                           CIVIL ACTION NO.:  1:16cv343 HSO-JCG

UNITEDHEALTH GROUP, INC.,
UNITED HEALTHCARE OF MISSISSIPPI, INC.
and OPTUM SERVICES, INC.                  DEFENDANTS

### COMPLAINT FOR DAMAGES
### AND OTHER RELIEF
### UNDER THE FALSE CLAIMS ACT

### FILED UNDER SEAL—PROCESS TO BE WHTHELD UNTIL FURTHER
### ORDER OF THE COURT

### JURY TRIAL DEMANDED

Plaintiff, United States of America, *ex rel*: Gwendolyn Porter, as Relator, by and through counsel, states as follows:

### INTRODUCTION

1.     This is an action brought by plaintiff, the United States of America (United States or Government), by and through the relator, Gwendolyn Porter (Ms. Porter) to recover treble damages and civil penalties under the False Claims Act 31 USC §§3729 – 3733 (FCA), and to recover damages from defendants UnitedHealth Group, Inc., United Healthcare of Mississippi, Inc. and Optum Services, Inc.

2.     The FCA provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, submits or causes to be

submitted a false or fraudulent claim to the United States Government for payment or approval is liable for a civil penalty of up to $11,000 for each claim, plus three times the amount of the damages sustained because of the false claim. The FCA allows any person having knowledge of a false or fraudulent claim against the United States to bring an action for herself and for the United States, and to share in any recovery. The party bringing the action is known as a "relator" and the action that a relator brings is called a *qui tam* action.

3 Relator, Gwendolyn Porter, files this action on behalf of the United States pursuant to the *qui tam* provisions of the FCA, 31 USC §3730 (b) (1).

4. From June of 2015 through the present (the "relevant period") UnitedHealth Group, Inc., and its wholly owned subsidiaries (collectively, "United") knowingly, systematically and illegally billed Medicaid through the state administrative agencies for services rendered by purported "Case Managers" or "Care Managers" (CM's) who, in fact, were not properly licensed in the states to act as such.

5. In furtherance of this fraudulent scheme, United provided false certifications to the State of Mississippi, Department of Medicaid, as well as the United States Department of Health and Human Services that such Care Management services had been conducted under proper supervision of a Registered Nurse, when, in fact, they had not.

6. UnitedHealth Group, Inc. is the largest Medicaid provider in the United States. Currently UnitedHealth Group Inc. is ranked as the 6th largest

American Company. UnitedHealth Group Inc., according to its most recent literature, operates in all 50 states and more than 125 other countries.

7.    United Healthcare of Mississippi, Inc. on information and belief, is a wholly owned subsidiary of UnitedHealth Group, Inc., and operates as a Coordinated Care Organization delivering Medicaid services in the state of Mississippi, one of the most impoverished states in the Union and, correspondingly, one of the states whose citizens are the most dependent upon Medicaid.

8.    Optum, Inc. is also a wholly owned subsidiary of UnitedHealth Group, Inc. and has been described by UnitedHealth Group, Inc. as the "health services platform" for UnitedHealth Group, Inc.[1] Upon information and belief, Optum Services, Inc. employs and staffs the positions necessary for the many wholly owned subsidiaries servicing the individual states, by UnitedHealth Group, Inc., such as United HealthCare of Mississippi, Inc. to operate.

9.    Throughout the relevant period, United[2] knowingly, or with willful blindness or reckless disregard for the truth, represented that all of its Case or Care Managers (CM's) in Mississippi were either properly licensed Registered Nurses (RN's) or Licensed and registered Social Workers[3]; or alternatively, certified falsely that such Care Management services had been conducted under proper supervision of a Registered Nurse, when, in fact, they had not.

---

[1] See Exhibit 1.
[2] Throughout the commission of this fraud in Mississippi, UnitedHealth Group, Inc., acted through its agents, United HealthCare of Mississippi, Inc., and Optum Services, Inc. Thus, throughout this Complaint, the three entities will be collectively referred to as "United".
[3] The social worker degree referred to must be a four-year degree from an accredited college.

10.    Instead, many of the CM's were not and are not licensed Registered Nurses nor licensed and registered Social Workers, but were and are, instead, Licensed Practical Nurses (LPN's), or even unlicensed personnel, not meeting the minimum legal requirements as set forth by the Mississippi Board of Nursing, and not as represented to the Mississippi Division of Medicaid, or to the state Medicaid recipients by United.[4]

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this Complaint pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a).    The Court has personal jurisdiction over the defendants because the defendants transact business within the Southern Division of the United States District Court for the Southern District of Mississippi.

12.    Under the False Claims Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on the defendants until the Court so orders.  The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information.

13.    This action is not based upon any public disclosure of information within the meaning of 31 U.S.C. § 3730(e)(4)(A).  The Relator has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), derived through her employment and/or contacts with United, and her own investigations of the information on which the allegations set forth in this

---

[4] While the legal requirements for CM's may vary from state to state, it is believed that, in all likelihood, this fraud was, and is, widespread.

4

Complaint are based. Relator has voluntarily provided this information to the Government prior to filing the Original Complaint. To the extent any of these allegations may have been publicly disclosed, within the meaning of 31 U.S.C. § 3730(e)(4)(A), the relator was the source of the disclosures.[5]

## PARTIES TO THE ACTION

14.    Relator, Gwendolyn Porter, a citizen of the United States and a resident of Grenada, Mississippi, is suing on behalf of and in the name of the United States of America and on behalf of herself personally. Mrs. Porter is a duly licensed RN in the state of Mississippi.[6] Mrs. Porter is currently employed by UnitedHealth Group, Inc. through its wholly owned subsidiary, Optum, and has been so employed since September of 2012. Mrs. Porter, during her entire tenure with United has worked as a Case or Care Manager.

15.    Defendant UnitedHealth Group, Inc. is a Fortune 500 Company, and does business in the state of Mississippi. Even though doing business in the State of Mississippi through its wholly owned subsidiaries, UnitedHealth Group, Inc. has never, itself, registered to do business in the state of Mississippi. Thus, UnitedHealth Group, Inc. may be served in accordance with the statutes governing service upon non-resident corporations not registered to do business in the state of Mississippi.

---

[5] Relator met with representatives of the United States Attorney's Office division of Medicaid Fraud as well as representatives of the Attorney General's office (by phone conference) and representatives of Health and Human Services OIG in June of 2016 in respect to a similar fraud involving another corporation. During this meeting, relator, and her counsel informed these representatives of the fact that UnitedHealth Group was now engaging in a similar fraud.
[6] A copy of the documents certifying that Mrs. Porter is a Registered Nurse from the Mississippi Board of Nursing is attached hereto as "Exhibit 2".

16.     Defendant United HealthCare of Mississippi, Inc. Is a wholly owned subsidiary of UnitedHealth Group, Inc. which was created by UnitedHealth Group, Inc. to operate as a Coordinated Care Organization in the state of Mississippi, and may be served with process through its registered agent for service, C T Corporation System 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

17.     Defendant Optum Services, Inc. is also a wholly owned subsidiary of UnitedHealth Group, Inc. which was created to operate and which is operating within the state of Mississippi so as to deliver certain specified services and products through Medicaid. Optum Services, Inc. may be served with process through its registered agent for service, C T Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

## BACKGROUND

18.     Medicaid is a government program for persons of all ages whose income and resources are insufficient to pay for health care.  It is the largest source of funding for medical and health-related services for people with low income in the United States. It is a means-tested program that is jointly funded by the state and federal governments and managed by the states, with each state currently having broad leeway to determine who is eligible and for implementation of the program.

19.     Each state determines eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the

payment from accounts that draw on the United States Treasury. 42 CFR §§430.0 – 430.30 (1994). The federal share of Medicaid expenditures varies by state and can fluctuate annually.[7]

20.     Mississippi, like many states, does not implement the entire Medicaid program directly, but outsources most of that implementation to outside companies that it deems qualified to do so.   These companies are in the business of providing prepaid comprehensive health care services as defined in 42 CFR Sec. 438.2.  These outside companies are known as "Coordinated Care Organizations", or "CCO's".  This legislation was implemented in Mississippi on January 1, 2011, creating a coordinated care program for targeted individuals. In Mississippi this program is known as "Mississippi Coordinated Care Network" or "MississippiCAN" (hereafter, MSCAN)

21.     MSCAN includes Medicaid services and products in all 82 counties in Mississippi.  A Program Summary of the MSCAN Program is attached hereto as "Exhibit 3".

22.     Periodically, any company which has been prequalified by the state of Mississippi,[8] is allowed to submit a bid, or Proposal, on what it would charge to provide those comprehensive health care services in accordance with the contractual terms as set forth by MSCAN.

23.     Those served by Medicaid are among the least educated or least

---

[7] This federal participation in the monies reimbursed to Medicaid recipients, either directly or indirectly, necessarily involves federal dollars - thus subjecting the perpetrators of any fraud on that system to the penalties and consequences imposed by the federal False Claims Act.
[8] In order to be eligible to bid on a Contract, the bidding entity must first be an entity eligible to enter into a full risk capitated contract in accordance with Section1903(m) of the Social Security Act and 42 CFR sec. 438.6(b), and be engaged in the business of providing prepaid comprehensive health care services as defined in 42 CFR sec. 438.2.

advantaged citizens of the state. As a result, and in an effort to protect those intended recipients, the Division[9] has placed strict and rigorous compliance standards upon those seeking to bid on the MSCAN Contracts. Additionally, the MSCAN Contracts themselves impose strict and rigorous compliance standards. As a result, only two organizations have ever been able to qualify as Coordinated Care Organizations (CCO's) in Mississippi, and thereby participate in the Mississippi Coordinated Access Network. Those two organizations are: United HaelthCare of Mississippi, Inc., a wholly owned subsidiary of UnitedHealth Group, Inc. and Magnolia HealthPlan, Inc. a wholly owned subsidiary of Centene Corporation.

24.     Those citizens of Mississippi who are eligible to participate in MSCAN, referred to as "Beneficiaries", are those that receive Medicaid through:

> A.     Supplemental Security Income;
>
> B.     DHS Foster Care Children;
>
> C.     Disabled Children living at home;
>
> D.     The Working Disabled;
>
> E.     Those who have contracted breast or cervical cancer;
>
> F.     Pregnant women and infants;
>
> G.     Family/children participating in TANF (Temporary Assistance for Needy Families); and
>
> H.     All newborns.

25.     If a citizen of Mississippi is a Medicaid recipient over the age of nineteen (19) in any of the categories listed above, then enrollment in one of the

---

[9] "Division" refers to the State of Mississippi, Office of the Governor, Division of Medicaid.

two CCO's, in Mississippi, either UnitedHealthcare Community Plan (United) or Magnolia HealthPlan (Centene), is mandatory. If the Medicaid recipient does not choose one or the other plan in which to enroll, one will be chosen for him/her by the state.

26. As a result, these two CCO's in Mississippi enjoy a duopoly with respect to the delivery of and payment for certain Medicaid services and products.

27. Essentially, these two CCO's operate as do private insurance companies would with respect to the administration of claims and services, except that the funds being administered are not private funds; they are federal Medicaid funds.

28. As reflected on "Exhibit 4" to this Complaint, both CCO's have grown substantially since they were established. As of December of 2015, the latest date for which counsel has been able to obtain data, United serves 249,257 Mississippians on a monthly basis.

29. Examples of those services and products for which the CCO's are paid are:

      A.    Physician office visits;

      B.    Durable medical equipment;

      C.    Vision care;

      d.    Dental care;

      E.    Physical and other forms of therapy;

      F.    Hospice;

G.     Pharmacy needs;

H.     Mental health services;

i.     Certain outpatient hospital services such as chemotherapy, emergency room visits, and x-rays.

J.     Inpatient services.[10]

30.     As compensation for these services, CCO's receive a monthly per Member[11] capitation[12] rate, similar to an insurance premium, depending both upon the probable medical needs of that particular Member and the region of the state in which the Member resides. An example of the capitation rate schedule in effect in Mississippi is attached as "Exhibit 5".[13]

31.     As a consequence of being awarded one of the two contracts available in the state of Mississippi, United agreed to abide by and strictly comply with the contractual requirements as specified by MSCAN.

## CONTRACT REQUIREMENTS

32.     United has been successful in being awarded multiple successive contracts between it and MSCAN. Attached as Exhibit 6[14] is what is believed to be a copy of the current contract (hereinafter referred to as the "Contract") under

---

[10] This latest category of services, inpatient services, was only recently added.
[11] A "Member" is a Medicaid Beneficiary under MSCAN who has chosen or been assigned to one of the two CCO's.
[12] "Capitation Rates" are contractually agreed upon monthly rates that MSCAN pays the CCO for each Beneficiary who is a Member of that CCO during that particular month.
[13] The rate schedule attached as "Exhibit E" to this Complaint is the one that was in effect in Mississippi in 2013. This rate schedule is subject to change every year.
[14] The only contract that plaintiff has been able to obtain is one dated November 30, 2015, and contains many blank spaces wherein the name of the "Contractor" is left out. However, certain pages, such as page 7 and the signature pages, 177 and 178 make reference to the Contractor as "United HealthCare of Mississippi, Inc."

which United is operating as a CCO in the State of Mississippi.[15]  This Contract

commenced on July 1, 2014, and is set to terminate on June 31, 2017.[16]

33.    On information and belief the operative contractual obligations, and

the representations made by United in the original contract regarding Case or

Care Managers are not materially different from the obligations and

representations found in the current Contract.

34.    Specifically, the Contract includes "reliance" language that states:

> Whereas, the Division contracted with a Coordinated Care
> Organization (Contractor) to obtain services for the benefit of
> certain Medicaid beneficiaries and the Contractor has provided to
> the Division continuing proof of the Contractor's ... **capability to
> provide quality services efficiently, effectively and
> economically during the term of this Contract, upon which the
> Division relies in entering into this Contract.** [17]

(Emphasis added)

35.    Most importantly, the Contract includes language in the section

regarding compliance with **State and Federal Law,** which states:

> The **Contractor shall comply with all applicable Federal
> State and local laws and regulations and standards, as have
> been or may hereinafter be established, specifically including
> without limitation, the policies, rules, and regulations of the
> Division.** [18]

(Emphasis added)

36.    The Contract includes language in the section dealing with

**Contractor Representations**, the operative language of which states:

---

[15] The actual commencement date of the original contract between United and MSCAN is
unknown by the plaintiff.  However, at the time that plaintiff began working with United through
Optum, in September of 2012, United was operating as a Coordinated Care Organization in the
state of Mississippi, so a previous contract had to be in existence.

[17] Exhibit 6, p. 7.
[18] Exhibit 6, p. 9.

The Contractor hereby **represents and warrants to the Division that:**

      3.     **All information and statements contained in the Mississippi Coordinated Access Network (MississippiCAN) Contract Proposal and responses to additional letter inquiries** submitted by the Contractor to the Division **are true and correct as of the date of this Contract.**

      .......

      8.     **All covered services provided by the Contractor will meet the quality management standards of the Division,** and will be furnished to Members as promptly as necessary to meet each individual's needs.[19]

(Emphasis added)

37.    The Contract includes language in the section dealing with **Division Policies and Procedures** which states:

      **The Contractor shall comply with all applicable policies and procedures of the Division, such as Mississippi Administrative Code, Title 23, specifically, including without limitation all policies and procedures applicable to each category of Covered Services for the MississippiCAN program which are also covered by the State Plan,** all of which are hereby incorporated into this Contract by reference and form an integral part of this Contract.[20]

(Emphasis added)

38.    The Contracts includes the following language in the section dealing with **Administration, Management, Facilities, and Resources:**

      The **Contractor shall maintain** at all times during the term of this Contract **adequate staffing,** . . . sufficient to serve the needs of Members, **as specified in this Contract, RFP, Contractor's Proposal, and in accordance with appropriate standards of both specialty and sub-specialty care.**[21]

(Emphasis added)

39.    The Contract includes the following language in a section

---

[19] Exhibit 6, p. 10-11.
[20] Exhibit 6, p. 18.
[21] Exhibit 6, p. 18.

specifically addressing Care Management needs as follows:

> The Contractor shall also have thee following staff located in Mississippi, at a minimum:
>
> . . . .
>
> **5. Sufficient medical management staffing to perform all necessary medical assessments <u>and to meet all Mississippi Medicaid Enrollees' case management needs at all times.</u>**[22]

(Emphasis added).

40.    The Contract includes a provision that mandates strict compliance standards regarding the content and truthfulness of marketing of services and products by United.    In fact, United is precluded from marketing to targeted beneficiaries who are not already enrolled as Members with United.    All distribution of marketing materials to these targeted, and as yet unaffiliated, persons is to be done by the Division itself.    However, United is affirmatively tasked with the responsibility of developing the marketing materials that are to be distributed to these unaffiliated persons by the Division.    In doing so, the Section of the Contract dealing with **Marketing**, provides:

> The **<u>Contractor shall develop marketing materials</u>** such as written brochures and fact sheets. **<u>Marketing plans and materials shall not mislead, confuse, or defraud the Members's or the Division.</u>**
>
> . . . . .
>
> **<u>Marketing and promotional activities (including Provider promotional activities) must comply with all relevant Federal and State laws . . . .</u>**[23]

(Emphasis added)

---

[22] Exhibit 6, p. 20.
[23] Exhibit 6, p. 69-70.

41.    The Contract provides that the Contractor (United) may distribute

marketing materials to Medicaid beneficiaries where the beneficiary is currently

enrolled with the Contractor. [24]

42.    Expressly included in the Contract is a section dealing with

**Prohibited Marketing and Outreach Activities**, which, in pertinent part, states:

> The following are **prohibited** marketing and outreach
> activities targeting prospective Memebers under this Contract:
>
> a.    Engaging in any informational or marketing
> activities **which could mislead, confuse, or defraud Members or
> misrepresent the Division. (42 CFR §438.104)**[25] [26]

(Emphasis added)

## "CARE MANAGEMENT"

43.    In order to take care of Members who have chronic or special

health care needs,[27] MSCAN requires that the Contractor establish a "Case" or

"Care" Management Program.

44.    "Care Management" is specifically defined in the Contract as:

> A set of Member-centered, goal oriented, culturally relevant,
> and logical steps to assure that a Member receives needed
> services in a supportive, effective, efficient, timely, and cost-
> effective manner. Care Management is also referred to as Care
> Coordination.[28]

45.    So important is the implementation of a competent, well-run Care

---

[24] Exhibit 6, P. 70-71.

[25] Exhibit 6, p. 71.

[26] As will be shown subsequently in this Complaint, the defendants' conduct violates not only the Division Contracts attached hereto, but also constitutes prohibited conduct under the federal regulations instituted by Congress regarding the truthfulness of marketing materials, both as to the intended beneficiaries and to the states.

[27] Examples of such chronic or special health care needs are Cancer, Multiple Sclerosis, Kidney Disease, HIV/Aids, Congestive heart disease, Sickle Cell Anemia, Hypertension, Organ Transplants and a multitude of other complex medical conditions.

[28] Exhibit 6, p. 24.

Management program that an entire section of the Contract is devoted to it. Section 8 of the Contract is entitled "**CARE MANAGEMENT**".[29] Among the first steps in providing effective Care Management, is the task of assigning risk levels to those Members in need of Care Management. This is accomplished through the completion of a detailed health risk **assessment** for members, which includes an assessment of the Member's needs and an assignment to a risk stratification level. This risk stratification level will determine the intensity of intervention and follow-up care required for each member.[30]

46.     The important task of assessing that members needs is left up to the Care Manager. As specified in the Contract:

> The Care Manager must contact the Member via telephone or face-to-face interview to **assess** the Member's Care Management needs. **This detailed health risk assessment must evaluate the Member's medical condition(s), including physical, behavioral, social and psychological needs. The goal of this assessment is to confirm the Member's need for Care Management, identify the Member's existing and/or potential health care needs, determine the types of services needed by the Member and begin the development of the treatment plan.** The Contractor will determine the need for an on-site visit at the Member's residence to complete this assessment. This detailed health risk assessment must occur within 30 (30) calendar days from Members newly assigned to the High or Medium risk levels as a result of the Health Risk Screening, referral and/or predictive modeling.[31]

47.     Among the items to be assessed, it is the Care Managers duty to identify the severity of the Member's condition/disease state, and

---

[29] Exhibit 6, pp. 98 - 106
[30] Exhibit 6, p. 99.
[31] Exhibit 6, p. 99.

to evaluate co-morbidities, or multiple complex health care conditions.[32]

48.     It is apparent from the terms of the Contract that those in need of Care management services are those who suffer from the most serious illnesses.   As specified on page 100 of the Contract, "[a]t a minimum, the Contractor shall provide Care Management services to all Members identified with the following chronic conditions: diabetes, asthma, hypertension, obesity, congestive heart disease, and organ transplants."

49.     With respect to those Members who are identified as medium risk or high risk, those Members will be assigned a Care Manager.[33]

50.     The services to be afforded to the Members identified as medium risk by the Care Manager assigned to them are at the minimum:

    a.     Facilitate relapse prevention plans for Members with depression and other high – risk behavioral health conditions and their PCPs/Community Mental Health Centers/Private Middle Help Centers (e.g. patient education, extra clinic visits, and follow-up phone calls);

    b.     Partner with Provider practices having higher medication adherence rates to identify best practices and leverage tools and education to support practices

---

[32] Exhibit 6, p. 99.
[33] Exhibit 6, p. 102.

with lower rates of adherence;

c. Educate Provider office staff about symptoms of exacerbations and how to communicate with patient;

d. Develop speaking point and triggers for making emergency appointments; and

e. Develop specific forms and monitoring tools to support monitoring of conditions, behaviors, risk factors or unmet needs.[34]

51. The services to be afforded members identified as high risk by the Care Manager assigned to them are all of those services afforded those deemed to be medium risk, plus, at the minimum:

a. As appropriate, form inter-disciplinary treatment teams to assist with development and implementation of individual medical treatment plans;

b. Provide list of community resources (for referral) including Medicaid PCPs, Certified Diabetic Educators, free exercise classes, nutritional support, etc.;

c. Identify Providers with special accommodations (e.g., sedation dentistry);

d. Educate staff about barriers members experienced in making and keeping appointments;

---

[34] Exhibit 6, p. 102.

e.    Facilitate group visits to encourage self-management of various physical and behavioral health conditions/diagnoses such as pregnancy, diabetes and tobacco use; and

f.    Communicate on a patient-by-patient basis on gaps/needs to assure patient has baseline and periodic medical evaluations from the PCP.[35]

52.    Also included among those requiring Care Management services are those who are identified as high-risk pregnant women.[36]

## THE ROLE OF THE CARE MANAGER

53.    As stated earlier, in order to effectively provide the services unique to each Member facing his or her complex medical or behavioral problem, as required by MSCAN, the Contractor (United) is obligated to assign each such Member a Care Manager or (CM) who is responsible for attending to that Member's special complex medical or behavioral needs.

54.    For those Members who are experiencing complex medical issues, United is required to assign a Registered Nurse (RN) as their Case Manager.

55.    According to United's own Member handbook:

If you have a chronic health condition like asthma or diabetes, United Healthcare Community Plan has a program to help you live with your condition and improve the quality of your life. These programs are voluntary and available at no cost to you. The programs give you important information about your health condition, medications, treatments and the importance of follow-up visits with your physician.

---

[35] Exhibit 6, p. 103.
[36] Exhibit 6. P. 103

18

A team of **registered nurses** and social workers will work with you, your family, your PCP, other healthcare providers and community resources to design a plan of care to meet your needs in the most appropriate setting. . . .[37]

(Emphasis added).

56. For those Members who are experiencing complex physical illnesses such as those listed earlier, United must assign an RN as the Care Manager in Mississippi.[38]

57. For those Members who are experiencing complex behavioral health issues, such as mental illness, United may assign either an RN or a licensed Social Worker,[39] or both, as their Care Manager.[40]

58. The vast majority of these Care Management services are performed telephonically.[41] Specifically, Section 8.1 of the Contract states in part:

The Care Manager must contact the Member via telephone or face-to-face interview to assess the Member's Care management needs. This detailed health risk assessment must evaluate the Member's medical condition(s), including physical, behavioral, social and psychological needs.[42]

59. In no event, is United to assign a Care Manager who is neither a Registered Nurse nor a licensed Social Worker.

**MISSISSIPPI LAW DOES NOT PERMIT AN LPN TO SERVE AS A CASE OR CARE MANAGER**

60. The Mississippi Nurse Practicing Act was enacted on July 1 2010.

---

[37] See the excerpt from the United Member Handbook (page 43) attached hereto as Exhibit 7.
[38] See affidavit of Gwendolyn Porter attached hereto as Exhibit 8.
[39] These Social Workers must hold a Bachelor's Degree or its equivalent, and be properly licensed in the state.
[40] See Affidavit of Gwendolyn Porter attached hereto as Exhibit 8.
[41] The relevance of this fact will become obvious later in this Complaint.
[42] Exhibit 6, p. 99.

It is codified at Miss. Code Ann. Sec. 73-15-1, et seq.

61.    The scope of practice for both RN's and LPN's is set forth in Sec.

73-15-5 of the Mississippi Code.

62.    With respect to RN's, the scope of practice is defined, in pertinent

part as follows:

> The practice of nursing by a registered nurse means the
> performance for compensation of services which requires
> substantial knowledge of the biological, physical, behavioral,
> psychological and sociological sciences and of nursing theory as
> the basis for assessment, diagnoses, planning, intervention and
> evaluation in the promotion and maintenance of health
> management of individuals' responses to illness, injury or infirmity;
> the restoration of optimum function; or the achievement of a
> dignified death . . . . [43]

63.    At the very core of Case or Care Management is the CM's

performance of an "assessment, diagnoses, planning, intervention and

evaluation in the promotion and maintenance of health management of

individuals' responses to illness, injury or infirmity; the restoration of optimum

function; or the achievement of a dignified death."

64.    On the other hand, with respect to LPN's, the scope of practice is

defined, in pertinent part, as follows:

> The practice of nursing by a licensed practical nurse means
> the performance for compensation of services requiring basic
> knowledge of the biological, physical, behavioral, psychological,
> and social sciences and of nursing procedures which do not require
> the substantial skill, judgment and knowledge required of a
> registered nurse.  These services are performed under the direction
> of a registered nurse or a licensed physician or licensed dentist and
> require standardized procedures in the observation and care of the
> ill, injured and infirm . . . . [44]

---

[43] Miss. Code Ann. Sec. 73-15-5(2).
[44] Miss. Code Ann. Sec. 73-15-5(5).

20

65. Clearly the statute dictates that a nursing job requiring independent assessment, diagnoses, planning, intervention and evaluation of a patients' needs is beyond the scope of practice of the LPN.

66. Furthermore, the statute requires that the LPN, in the performance of her duties, basic though they may be, are only to be performed under the direct supervision of either an RN, a licensed physician, or a licensed dentist.

67. In each case in which an LPN served as a Case Or Care Manager the LPN's primary job was to assess, diagnose, plan, intervene, and evaluate the Member's needs. These are activities are beyond the scope of practice of the LPN in Mississippi, regardless of the level of supervision.

## MISSISSIPPI REGULATIONS DO NOT PERMIT LPN'S TO SERVE AS CARE MANAGERS

68. The practice of nursing in Mississippi is also subject to compliance with the Administrative Code of the Mississippi Board of Nursing.[45]

69. The scope of practice of the Registered Nurse in Mississippi is defined in Chapter 1 of Part 2830 of Title 30 of the Administrative Code of Mississippi.

70. The scope of practice of the LPN is defined in Chapter 2 of Part 2830 of Title 30 of the Administrative Code of Mississippi.

71. A comparison of the two clearly demonstrates that the assessment functions required in case or care management are not within the scope of practice of the LPN.

---

[45] Title 30: Professions and Occupations, Parts 2801-2900.

72.     The simplest and most direct explanation of differences in the function of the RN as opposed to the LPN can be found on the Mississippi Board of Nursing's website under Frequently Asked Questions:

> 119.   Function of the registered nurse according to 30 Miss.Code, Pt. 2830, Chapter 1:
>
> The registered nurse shall be held accountable for the quality of nursing care given to patients. This includes but is not limited to, **assessing the patient's needs, supervising, formulating a nursing diagnosis, planning for, implementing and evaluation of the nursing care in the promotion and the maintenance of health of each patient for whom responsibility has been accepted.**
>
> The registered nurse is accountable for the quality of care given by self or others being supervised. The registered nurse may assign duties to other qualified personnel; assigned duties of medication administration of patient medications to other licensed nurses only except as set out in part 2860, rule 1.3 (a) (2) of the Administrative Code; and assigned duties for giving patient treatments to licensed nurses and/or auxiliary workers based upon knowledge of their educational preparation and experience. The registered nurse remains accountable for the acts carried out, as well as, the outcome of the acts delegated.
>
> (Emphasis added).

73.     This contrasts drastically with the explanation given of an LPN's function:

> 121.   Function of the LPN
>
> The licensed practical nurse gives nursing care under the direction of the RN, licensed physician or licensed dentist which does not require the specialized skill, judgment and knowledge required of an RN. This includes but is not limited to assisting the RN in the planning, implementation and evaluation of nursing care, observing, recording, reporting, and performing procedures for which the LPN has the necessary degree of skill and judgment. The LPN shall not be supervised by unlicensed personnel.

74.     So as to remove all doubt, also included in the "Frequently Asked Questions" section of the Nursing Board's website, is the explicit determination that the decision-laden practice of Case or Care Management is not within the scope of practice of the LPN. Question number 93 deals with the subject of Telenursing, and states as follows:

**Telenursing**

> Is (sic) telephonic case referrals and telephonic case management within the scope of practice of the LPN?
>
> **Telephonic case referrals and case management (on site and telephonic) are not within the scope and practice of the licensed practical nurse in Mississippi.** They are within the scope and practice of the registered nurse.[46]

(Emphasis added)

75.     Accordingly, in order to serve as a Case or Care Manager in administering the services set forth by MSCAN regarding complex medical diseases in the Contracts with United, the Case or Care Manager must be an RN. An LPN is simply not one who is qualified by training and experience, to be capable to serve as a Care Manager in the state of Mississippi.

76.     Likewise, an LPN is not one who is legally allowed to:

> ... contact the Member via telephone or face-to-face interview to assess the Member's Care Management needs. This detailed health risk assessment must evaluate the Member's medical condition(s), including physical, behavioral, social and psychological needs.[47]

---

[46] See Exhibit 9 to this Complaint.
[47] See Exhibit 6, p. 99.

23

## THE STANDARDS OF PRACTICE IN MISSISSIPPI

77.     The Mississippi Board of Nursing from time to time issues "Position Statements" regarding common questions that may arise so as to give guidance in complying with the laws and regulations of the State of Mississippi with respect to nursing.

78.     One such Position Statement was issued by the Mississippi Board of Nursing on December 3, 2011. This Position Statement is entitled, "The LPN and the Assessment Functions". A copy of the Position Statement is attached to this Complaint as Exhibit 10.

79.     As the title indicates, the Position Statement directly addresses the issue of whether the Assessment Function is within the scope of practice of the LPN, and if so, to what extent.

80.     The inescapable conclusion of the Mississippi Board of Nursing is that the "comprehensive nursing assessments" such as those required of a Case or Care Manager, are exclusively within the province of the registered Nurse, and are not within the scope of practice of the LPN.

81.     Case Management at its very core requires comprehensive assessment functions. In fact, the first step of the process of Case or Care Management is for the Case or Care Manager to conduct an initial assessment of the Member's health.

82.     From the foregoing discussion, it is abundantly clear that Mississippi state statutory law, (Miss. Code Ann. Sec. 73-15-1 et seq.); Mississippi Regulations (30 Miss. Admin. Code pt. 2830) and the nursing

standards of the Mississippi Board of Nursing (Position Statement dated December 3, 2011) dictate that LPN's are not permitted to practice Case or Care Management in the State of Mississippi. No legitimate argument can be made otherwise.

## RELATOR IS CURRENTLY A CARE MANAGER
## EMPLOYED BY UNITED

83.    Gwendolyn Porter, the relator herein, is currently employed as a Care Manager for United. She has been so employed since September of 2012. Mrs. Porter was, and is, a Registered Nurse, licensed by the Mississippi Board of Nursing.[48]

84.    When Mrs. Porter began working at United, in September of 2012, United was in complete compliance with the statutes, regulations and standards of the State of Mississippi with respect to its use of properly licensed personnel to serve as Case or Care Managers. All of the Case or Care Managers employed by United to serve in these positions were Registered Nurses.

85.    The practice of utilizing less expensive LPN's to serve as Care Managers began in June of 2015 and continues to this day.[49]

86.    During her employment with United, Mrs. Porter possessed actual knowledge of the practices of United whereby United, instead of utilizing the services of RN's to act as Care Managers, knowingly and intentionally employed much less expensive LPN's to serve as Care Managers.[50]

87.    The following is a list of Case or Care Managers, conducting health

---

[48] Exhibit 8.
[49] Id.
[50] Id.

care assessments, who have worked for United who are LPN's, not RN's, and not legally permitted to conduct health care assessments:

| Name: | Location: |
|---|---|
| Danyelle Barnes | Pass Christian, MS |
| Darlene Braddock | Tupelo, MS |
| LaShunda Henderson | Lyon, MS |
| Tasha Lee | Grenada, MS |
| Jacqueline Poole | Hattiesburg, MS |
| Sophia McCorty | West Point, MS |
| Howard Sanders | Jackson, MS |
| Kimberley Stanford | Greenville, MS |
| Latoshia Welch | Ridgeland, MS |
| Jamie White | Gautier, MS |
| Lakisha Williams | McComb, MS |
| Sarah Williams | Meridian, MS |

## FALSE CERTIFICATIONS

88.     Beginning in June of 2015, United began the practice of utilizing Community Health Workers (CHW's) or Field Community Health Workers (FCHW's) who were not RN's, but instead were LPN's, to conduct Care Management assessments.

89.     Once these LPN's conducted and completed the assessments, United engaged in the practice of having an RN sign it so that it would look like the RN conducted the assessment and completed the assessment form.

90.     In point of fact, in most cases, the RN would have no contact at all with the member whose assessment was conducted by the LPN.

## FEDERAL REGULATIONS REGARDING THE TRUTHFULNESS OF MARKETING MATERIALS FOR MEDICAID SERVICES

91.     Federal Regulations require that the marketing materials of an entity such as United be "accurate, and [do] not mislead or confuse or defraud

26

the Beneficiaries or the State agency."[51]

## MISREPRESENTATIONS INCLUDED IN MARKETING MATERIALS

92.  Being cognizant that, for complex medical diseases or complex behavioral diseases, only RN's or licensed social workers may serve as Case or Care Managers, United has, nevertheless, knowingly and intentionally misrepresented the qualifications of some of its Case or Care Managers both to the Division and to the Beneficiaries or Members.

93.  On page 43 of the UnitedHealthCare Community Plan Handbook (2016), prepared by United, a copy of which is attached as "Exhibit 7", in the Section that addresses "Care Management", United states:

> **Disease and Care Management**
> If you have a chronic health condition like asthma or diabetes, UnitedHealthcare Community Plan has a program to help you live with your condition and improve the quality of your life. These programs are voluntary and available at no cost to you. The programs give you important information about your health condition, medications, treatments and the importance of follow-up visits with your physician.
>
> **A team of registered nurses and social workers** will work with you, your family, your PCP, other healthcare providers and community resources to design a plan of care to meet your needs and the most appropriate setting. I can also help you with other things like weight loss, stopping smoking, making appointments with your doctor and reminding you about special tests that you might need.
>
> You or your doctor can call us to ask if our care management or disease management programs could help you. If you or your doctor thinks a Care Manager could help you, or if you want more information about our care management or disease management programs, call us at . . . . . .
>
> (Emphasis added).

---

[51] 42 CFR 438.104(b)(2).

94.     This Handbook is distributed to every Medicaid Beneficiary in Mississippi who either choses United as its CCO, or is assigned to United by the state.[52]

95.     Nowhere, in any of its promotional material has United ever revealed the fact, either to the Division or to the Members, that it has been, and is using LPN's to serve as Case or Care Managers. Instead, with the full knowledge that the LPN's were acting as Case or Care Managers, and thereby acting illegally, United billed Medicaid for their services.

## DAMAGES
### (The Fraud is Baked in the Cake)

96.     The primary difference between an RN and an LPN is one of training and education. This additional training and education is designed to develop in the RN greater critical thinking skills than that of the lesser trained and educated LPN. These critical thinking skills are necessary for the assessment functions required of a Case or Care Manager.

97.     Obviously, Mississippi, like most other states, has deemed the enhanced critical thinking skills presumably possessed by one who holds an RN degree to be absolutely necessary and critical when that individual is placed in the largely autonomous, and decision-filled position of Case or Care Manager.

98.     This practice of using unqualified LPN's to serve as Case or Care Managers, has been utilized by United in Mississippi continuously since June of 2015. The damages that have been sustained by the recipients of Medicaid who

---

[52] As a result, this material misrepresentation has been made to every Member of the CCO operated by United in Mississippi.

suffer from complex medical conditions and have had their cases managed by an unqualified LPN are, at this time, undeterminable; and perhaps, in some cases, even catastrophic.[53]

99.    Not surprisingly, one who possesses an RN degree commands a greater salary, as a rule, than one who possesses only an LPN degree.

100.    In other words, by hiring unqualified LPN's to serve as Case Managers, and misrepresenting such Case Managers as being properly qualified RN's, United has cut corners, and saved itself money – money saved at the expense of the quality of care provided to Mississippian recipients of Medicaid.

101.    United, like other CCO's, does not charge Medicaid or the Division directly for the services rendered to the *individual* beneficiaries by the Case or Care Managers.  Instead, those services are essential benefits that are available to all participants in the MSCAN program, and lie at the very heart of the Coordinated Care Network system.[54] The charges for Case or Care Managers services are *therefore built into, and form an integral part of, the capitated rates which are paid to United monthly.*  Such Case or Care Management costs are therefore, essential base costs, which must be taken into account when arriving at a figure that would reasonably compensate United for such services through the capitated rates negotiated between the Division and United.

102.    In Mississippi, as in most other states, parties who desire to enter

---

[53] This lawsuit does not seek to recover on behalf of those who have been damaged by having an unqualified, and misrepresented, Case or Care Manager assigned to their case.  Such causes of action, if they exist, belong to the injured individual beneficiary.

[54] One of the underlying reasons for the creation of the Mississippi Coordinated Care Program was to utilize outside vendors who, through their expertise, could coordinate Members benefits, improve efficiencies in the system, and advise the beneficiaries how best they could navigate the maze we know as the medical system in this country.

into a contract owe each other a "Duty of Good Faith and Fair Dealing" in their negotiations. This duty essentially gives each party the legal right to rely upon the truthfulness of the representations made by the other in their negotiations.

103. In addition, the contract itself, as previously quoted in this Complaint, required United to employ staff who were legally qualified in the State of Mississippi to serve as Case or Care Managers.

104. MSCAN was entitled to assume that the people United intended to hire, and ultimately hired, to fill the positions of Case or Care Manager would be, at the very least, legally qualified to do so by education and experience. It also stands to reason that MSCAN would be justified in its assumption that these purportedly qualified individuals would be costly to employ, and would therefore justify higher capitated rates by United in order to compensate United for the higher labor costs.

105. By hiring unqualified and thereby less expensive employees to fill these necessary positions, United has fraudulently, and materially misrepresented, both to the Division and to the recipients, not only the capability of the individuals to perform such services, but also has materially misrepresented the underlying costs that have actually been incurred by United to supply those purported services.

106. These misrepresented costs formed a portion of the underlying data used by both United and the District in their negotiations to arrive at mutually agreeable capitated rates for serving Mississippians receiving Medicaid. The problem, of course, is that United actually knew at the time it

made its proposal to the Division that the underlying costs would be assumed by the District to be higher than they actually were. The District, on the other hand, because it assumed that United's employees would actually be "qualified", was under the misimpression that United's underlying costs were and would continue to be higher than United actually incurred.

107. As a result of these misrepresentations, the capitated rates paid to United by MSCAN have been fraudulently inflated.[55] The great majority of these fraudulently inflated payments have been reimbursed by the United States Government through the Medicaid program.

108. Accordingly, due to the nature of the capitated rate system for payment to United, *all* capitated rate payments made to United by MSCAN from June, 2015 to the present, constitute "False claims" within the meaning of the FCA. This is true regardless of whether a beneficiary's Case or Care Manager was an RN or an LPN; or whether the particular beneficiary even participated in the case management program. The reason that each and every capitated payment was fraudulent was that the underlying data, which formed the basis for all of the capitated rates, was fraudulently inflated.

109. Alternatively, each and every capitated rate payment made for a Beneficiary who was served by a Case or Care Manager who was neither a Registered Nurse nor a licensed social worker constituted a false claim within the meaning of the FCA.

---

[55] To put the fraud in terms familiar to the legal profession, it is the equivalent of charging a staff attorney's rates for a paralegal's work.

# THE FALSE CLAIMS ACT

110.   The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States, or knowingly using a false record or statement material to get false claims paid by the United States, 31 USC §3729 (a)(1)(A), (B) and (C) (2009). The FCA provides that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
> (B) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]
> (C) conspires to commit a violation of subparagraphs (A), (B), (D), (E), (F), or (G);
> .... Is liable to the United States government for a civil penalty of not less than $5,000 and not more than $10,000 as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, [citation omitted] plus 3 times the amount of damages which the Government sustained because of the act of that person . . .
> .....
> (b) For the purposes of this section - -
>> (1) the terms "knowing" and "knowingly" --
>>> (A) mean that a person, with respect to information –
>>>> (i) has actual knowledge of the information;
>>>> (ii) acts in deliberate ignorance of the truth or falsity of the information; or
>>>> (iii) acts in reckless disregard of the truth or falsity of the information; and
>>> (B) require no proof of specific intent to defraud.

31 USC §3729 (a), (b).

111.   Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Bill Collection Improvements Act of 1996, 28 USC

§2461 (notes), and 64 Fed. Reg. 47099, *47103 (1999), the civil penalties were adjusted to not less than $5,500 and no more than $11,000 for the violations occurring on or after September 29, 1999. See also 28 CFR §85.3(a)(9) (detailing current civil penalties of not less than $5,500 and not more than $11,000 for violations of the FCA).

## VIOLATION OF THE FALSE CLAIMS ACT

### COUNT I: False or Fraudulent Claims

### Violation of the False Claims Act, 31 U.S.C. sec. 3729(a)(1)(A)

112. Providers such as United, who participate in the Medicaid program, submit for payment the claims for services rendered to recipients to designated agencies within the respective states. In Mississippi, that state agency is, and has been, MSCAN. As this Complaint has demonstrated, since June of 2015, United has repeatedly submitted and/or caused the submission of false claims for capitated rate payments based, at least in part, upon case management services purportedly provided to Medicaid recipients by persons falsely represented to be either RN's or licensed social workers.

113. United knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for monthly capitated payments whose underlying costs had been misrepresented to the Division due to the fact that United employed unqualified, cheaper, LPN's to act as Case or Care Managers instead of the more expensive RN's as required by state law. United fraudulently misrepresented, both to the Division and to the recipients, not only the capability

of the individuals to perform such services, but also has materially misrepresented the underlying costs that have been incurred by United to supply those purported services. These misrepresentations to the Division, influenced the perception of the costs incurred by United resulting in fraudulently inflated capitated rates. As a result, all capitated payments made to United since the inception of the fraud, June of 2015, are False Claims within the meaning of the FCA.

114. Alternatively, United knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for monthly capitated payments on behalf of United Medicaid Beneficiaries who were undergoing Case or Care Management, but whose Case or Care Managers had been misrepresented as being Registered Nurses or licensed social workers when in fact, they were not.

115. This conduct constitutes willful conduct on behalf of defendants in violation of the False Claims Act, 31 U.S.C. sec. 3729 *et seq.* in that each and every claim for a capitated payment for a beneficiary or member being served by an alleged "Case Manager" who is neither a Registered Nurse nor a qualified Social Worker, constitutes a "False Claim" within the meaning of the act.

116. By virtue of the false or fraudulent claims presented or caused to be presented by the defendants, the United States has suffered damages.

117. Defendants are liable to the United States for treble damages under the FCA in an amount to be determined at trial, plus a civil penalty of no less than $5,500, and no more than $11,000 for each false claim presented, or caused to

be presented, by defendants.

## COUNT II: False Statements

### Violation of the False Claims Act 31 U.S.C. sec. 3729(a)(1)(B)

118.   Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. sec. 3729(a)(1)(B), as amended on May 20, 2009.

119.   Defendants are liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of no less than $5,500, and no more than $11,000, for each false claim presented or caused to be presented by defendants.

## COUNT III: Relator's Entitlement to Participation in United States' Recovery Pursuant to 31 U.S.C. sec. 3730(d)

120.   Gwendolyn Porter, a former employee of United, and the relator herein, voluntarily provided information of the false claims and their nature to the United States Attorney for the Southern District of Mississippi prior to the filing of this Complaint.

121.   This information was not publicly known prior to the revelation of the false claims by the relator herein.

122.   The relator also furnished documents and other material evidence to the United States Attorney regarding the false claims and misrepresentations made by the defendants, including emails and other internal documentation.

123.   In addition, since the Relator was at all material times a Registered Nurse, and one who was properly qualified in the State of Mississippi to serve as

a Case Manager, she did not participate in the fraudulent scheme perpetrated by United.

124. Furthermore, this Complaint, prepared by counsel for relator with the assistance of the relator, thoroughly examines the intricate and complicated capitation rate system and the underlying fraud, yet at the same time, sets forth the false claims and their nature in a simple and straightforward manner, allowing the United States to quickly, thoroughly and efficiently investigate these false claims and prosecute this action, both in the state of Mississippi, and in the other states in which United operates.

125. Accordingly, the *Qui Tam* Plaintiff, relator herein, should be awarded the maximum amount allowed pursuant to section 3730(d) of the False Claims Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America, *ex rel*: Gwendolyn Porter, and Gwendolyn Porter individually, request that judgment be entered in their favor and against defendants as follows:

1.    That process be issued requiring the defendants named herein to answer fully the allegations contained in this complaint;

2.    That on the First and Second Counts under the False Claims Act for the amount of the United States damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

3.    On the Third Count, that the *qui tam* Plaintiff/relator be awarded the maximum amount allowed pursuant to section 3730(d) of the Federal Civil False Claims Act;

4.    With respect to each count, interest, attorney's fees and costs as allowed by law and any and all further relief as the Court deems just and proper.

9.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States of America, *ex rel*: Gwendolyn Porter, and Gwendolyn Porter, individually as Relator, hereby demand trial by jury.

**RESPECTFULLY SUBMITTED** this the 16th day of September, 2016.

UNITED STATES OF AMERICA, *ex rel:*
**GWENDOLYN PORTER**

**Gwendolyn Porter, Relator**

**OF COUNSEL:**

C. W. Walker III
C. W. Walker III, LLC
512 Main Street
Greenville, MS 38702-0841
Phone: 662.820.0070
Email: bill@bill-walker.com
MSB# 6870

Darnell Pratt, II
Simmons & Simmons, PLLC
207 Main Street
P. O. Box 1854
Greenville, MS 38702-1854
Phone: 662.334.1666
Fax: 662.334.1665
Email: dpratt@simmonspllc.com
MSB# 104682

**STATE OF MISSISSIPPI**
**COUNTY OF GRENADA**

     **PERSONALLY CAME AND APPEARED BEFORE ME,** the undersigned authority in and for the jurisdiction aforesaid, the within named Gwendolyn Porter, who stated on her oath that the facts and matters contained in the above and foregoing document are true and correct as therein stated, and that with respect to those stated on information and belief, the undersigned Gwendolyn Porter verily believes such representations to be true and correct as stated herein.

     **SWORN TO AND SUBSCRIBED BEFORE ME** on this the 16 day of September, 2016.

Notary Public

My Commission Expires:

05-27-2020

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 45753
DEBORAH J. BRASWELL
Commission Expires
May 27, 2020
HOLMES COUNTY